559 So.2d 284 (1990)
J. Allen BAKER, M.D., Appellant/Cross Appellee,
v.
FLORIDA NATIONAL BANK, a National Banking Corporation, Appellee/Cross Appellant.
No. 89-1503.
District Court of Appeal of Florida, Fourth District.
March 28, 1990.
Rehearing and Rehearing Denied May 7, 1990.
*285 Freeman W. Barner, Jr., of Cromwell, Pfaffenberger, Dahlmeier, Barner & Griffin, North Palm Beach, and Alan Miller of Miller & Miller, P.A., West Palm Beach, for appellant/cross appellee.
Richard A. Kupfer of Wagner, Nugent, Johnson, Roth, Romano, Eriksen & Kupfer, P.A., West Palm Beach, for appellee/cross appellant.
Rehearing and Rehearing En Banc Denied May 7, 1990.
MUSSELMAN, JACK, Associate Judge.
This is an appeal of a Final Judgment of the trial court entered June 8, 1989. The appeal is based upon the propriety of the entry of summary judgment against the plaintiff/appellant on his claim for intentional infliction of emotional distress. Count Seven, upon which the summary judgment was granted, was one of eight counts filed against the bank by the appellant arising from the actions of the bank regarding a trust agreement wherein the bank held as trustee certain assets of the appellant. Count One of the complaint alleged breach of duty under the trust agreement and mismanagement of the trust by investing trust assets in tax free bonds in a rapidly declining market and in securities in which the bank allegedly had a financial interest. Count Two alleged negligence of the bank in its management of the trust assets. Count Three alleged breach of fiduciary duty arising from the same factual circumstances. Count Four alleged a breach of contract arising from the same factual circumstances. Count Five alleged wrongful conversion against the bank arising from the same set of facts. Count Six alleged a constructive trust theory against the bank arising from the same factual circumstances. Count Seven, which is the count involved in this appeal, alleged a cause of action for Dr. Baker the appellant's "emotional distress" caused by the doctor's discovery of the bank's investment of all his liquid assets in the fund that was declining in value, contrary to his desires, instructions, the investment plan the doctor prepared and the bank's proposal. Also the doctor believed the bank had taken advantage of the past relationship, abusing its confidential and fiduciary relationship for its own benefit, and in refusing to return his assets about which he was extremely sensitive. Summary judgment was granted. The doctor sought to recover from the bank intangible damages along with medical bills he incurred when he was hospitalized for a heart ailment. The case proceeded to trial on the other counts resulting in a verdict rendered in behalf of the appellant, Dr. Baker in the amount of $39,242.53 with prejudgment interest from and after May 8, 1987 through June 8, 1989 in the amount of $9,818.16 for total final judgment entered by the court below on June 8, 1989 of $49,060.69 with interest accruing thereafter. The plaintiff is a *286 medical physician who at the time of the incidents in question was a sixty-five (65) year old retired medical doctor. He had been a director of the Florida National Bank, the appellee herein, for a period of eleven (11) years from which board he had retired due to illness primarily relating to an asthma condition and was on medical disability.
In November, 1986 the appellee, bank, prepared for him an investment management proposal recommending various types of investments to the doctor for his assets to be invested in the trust with the bank. On March 5, 1987 the doctor executed a "Flex-Trust Agreement" wherein he placed in trust with the bank approximately $780,000.00 that had in the previous January been placed into a managing agency account set up for him until the trust was completed. He was the sole beneficiary of the trust and the trust provided that any investments could only be made upon Dr. Baker, the appellant's, direction. The trust was a revocable trust, however it contained within its terms a provision that the bank on certain conditions could assume full responsibility for the management and investment of the trust property. One of these events was the trustee's determination in its sole discretion that Dr. Baker had become incapable of managing his business and personal affairs by reason of mental or physical disability. Should the bank do this under the trust the full responsibility would thereafter fall upon the trustee, bank, and the agreement became irrevocable and Dr. Baker, as grantor of the trust lost control of the entire trust assets. Upon the death of the beneficiary, Dr. Baker, the trust agreement provided it would be distributed according to a schedule in the "Flex-Trust Agreement" which designated that distribution would be made to the personal representative of Dr. Baker's estate. Dr. Baker alleges that the assets transferred to the "Flex-Trust" were essentially all of his liquid assets and that their safety and liquidity were required to be preserved and not risked in any way. The trust also contained a provision that verbal instructions from the doctor, beneficiary, could be accepted by the bank in making their decisions involving his investments.
On or about March 5, 1987 the bank's representative called the doctor and advised him that the funds should be invested in the bank's tax free money market fund which was then paying 7% interest and with no risk to the principal. The doctor maintains that at that point he questioned the availability of such investment with a yield that high and that he wished further information to be more fully informed about the investment. The doctor further maintained that he requested further written information about the investment which the bank representative promised to furnish. The next communication the doctor alleges that he received was a letter received by him on the evening of March 30, 1987, in which the letter, dated March 25, 1987, indicated that the doctor had verbally approved with another bank official, not the writer of the letter, an investment of the entire fund of his trust in the bank's tax-exempt fund. The letter requested the doctor to give his written approval of the transaction and that it would be consummated by means of a purchase on April 1, 1987 by the investment of $770,000.00 in the referenced fund. At this point the doctor, stating he was exceedingly upset about the bank making such an investment which he had not authorized telephoned the bank trust officer on March 31, 1987 and objected to the investment, advised the bank that he wished all of his investment transactions stopped and reiterated that he never approved of such investment.
The appellee and appellant disagree as to what occurred by the telephone conversations mentioned. The bank maintains that Dr. Baker orally approved the investment of his trust estate in the municipal bond fund (the bank's tax free money market account) when the doctor spoke to Bill Wade, the bank officer, about it sometime in mid March, 1987. A Mr. Jacobson, another vice-president of the bank, sent Dr. Baker a letter confirming the bank would purchase the tax-exempt fund on April 1, 1987 pursuant to the verbal approval which the bank stated they believed they received. *287 Dr. Baker maintained that he called the bank on March 31, 1987 instructing them not to make the purchase on April 1, the following day, and the bank maintains that it did not receive that phone call from Dr. Baker until on or after April 1, by which time the investment had already been made. The bank officer informed Dr. Baker that as was stated in the original investment proposal to him this investment could not be redeemed until April 30, 1987.
After a personal meeting between Dr. Baker and officers of the bank, the bank wrote a letter to Dr. Baker that they would redeem the units on April 30 as he had instructed at the meeting. However, the bank was not willing, they say, to accede to Dr. Baker's request that he be reimbursed for whatever loss of principal value he might sustain during that month in the bond market nor to additionally pay him the interest he would have earned if the money had been left in the original money market fund. The principal value of the bond fund decreased during the month of April, 1987. The bank did in fact redeem Dr. Baker's units in the municipal bond fund on April 30, 1987, at which time Dr. Baker removed his money from the bank on May 8, 1987. Dr. Baker was returned the sum of $739,526.00, which resulted in a loss of about $39,000.00, due, as the bank says, to the immediate redemption of his interest in the municipal bond fund.
On April 29, 1987 Dr. Baker went into the hospital for three (3) days. He was suffering from angina and ventricular arrhythmia which the doctor attributes to the aggravation over the bank's investment of his money. This appeal was expedited at the request of the appellant because the doctor maintains that "risky surgery is necessary if he is to continue to live and that his cardiologist will not permit the surgery with the added risk of the stress and strain of this pending litigation."
The doctor contends that the bank knew or should have known of his physical condition and knew or should have known that such actions on the part of the bank would inexorably be cause of severe emotional distress. The record reflects that Dr. Baker had no history of heart disease prior to the problem incurred by him on April 29, 1987.
The issue of whether or not the activities of the defendant rise to the level of being extreme and outrageous so as to permit a claim for intentional infliction of emotional distress is a legal question in the first instance for the court to decide as a matter of law. In this regard see Diamond v. Rosenfeld, 511 So.2d 1031 (Fla. 4th DCA 1987):
As to the intentional infliction of emotional distress claim, the facts must be "`so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.'" Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277, 279 (Fla. 1985). "[I]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." Scheller v. American Medical International Inc., 502 So.2d 1268, 1271 (Fla. 4th DCA 1987). The trial court correctly concluded that, viewed in a light most favorable to the Rosenfelds, as a matter of law, the evidence presented did not satisfy this test.
511 So.2d at 1034.
The trial court therefore acted properly in making a decision such as it made on the basis of summary judgment. This determination can also be made during the case on a motion for directed verdict. It is nevertheless a matter for the court to decide. The court below was within it jurisdiction to so decide. This tort of outrageous conduct or intentional infliction of emotional distress has grown and matured through the courts until any conflict that existed between the various district courts recited in great detail in the case of Dominguez v. Equitable Life Assur. Soc., 438 So.2d 58 (Fla. 3d DCA 1983) was resolved by the Florida Supreme Court in the case of Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277 (Fla. 1985), wherein the independent tort was recognized as capable of standing alone. This evolved from some earlier cases, principally ones based upon *288 the reasoning in cases such as Kirksey v. Jernigan, 45 So.2d 188 (Fla. 1950), Kirker v. Orange County, 519 So.2d 682 (Fla. 5th DCA 1988), Dunahoo v. Bess, 146 Fla. 182, 200 So. 541 (1941), that "as a general rule, there can be no recovery for mental pain and anguish (emotional distress) unconnected with physical injury where the action is based on simple negligence." Kirker, 519 So.2d at 683.
The supreme court in McCarson adopted the language of Section 46, Restatement (Second) of Torts (1965), reading as follows:
d. Extreme and outrageous conduct. ... . It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"
... .
g. The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.
Section 46, Restatement (Second) of Torts (1965).
The court likened the tort of "Intentional Infliction of Emotional Distress," to that of assault, in that:
the law long has authorized a recovery for the distress caused by one who offers to do injury to another and has the apparent present ability to do so. We can perceive no valid reason why recovery should be permitted for purposely harmful conduct in the one instance but denied in the other.
Metropolitan Life Ins. Co. v. McCarson, 429 So.2d 1287, 1291 (Fla. 4th DCA 1983).
Even before McCarson, the essential question was what constituted "outrageous conduct", and numerous cases have arisen helping to shape the definition prior to the adoption of Section 46, Restatement (Second) of Torts (1965) above recited. See the Dominguez case, and others such as King v. Eastern Air Lines, Inc., 536 So.2d 1023 (Fla. 3d DCA 1987), Food Fair, Inc. v. Anderson, 382 So.2d 150 (Fla. 5th DCA 1980), especially on page 152, and the case of Ford Motor Credit Co. v. Sheehan, 373 So.2d 956 (Fla. 1st DCA 1979). The courts have also turned to the definitions of activities giving rise to punitive damages wherein the words outrageous, malicious and other words of serious import have also been used.
There is however imposed upon this tort now matured to its own in the McCarson case the additional modification that the activity may be privileged under such circumstances in the case involving contractual rights or whether or not the actor is simply insisting upon his legal rights in a permissible way even though he is well aware that such insistence is certain to cause emotional distress. This has led courts dealing "outrageous conduct" to declare as follows:
Finally, with regard to the trial court's order granting the Video Barn's ore tenus motion to strike appellant's claim for damages for mental and emotional suffering under Count I (breach of contract) of the complaint Florida case law holds that "where the gravamen of the proceeding is breach of contract, even if such breach be willful and flagrant, there can be no recovery for mental pain and anguish resulting from such breach," Industrial Fire & Casualty Ins. Co. v. Romer, 432 So.2d 66, 67 (Fla. 4th DCA), rev. denied, 441 So.2d 633 (Fla. 1983) citing Henry Morrison Flagler *289 Museum v. Lee, 268 So.2d 434, 436 (Fla. 4th DCA 1972).
Floyd v. Video Barn, Inc., 538 So.2d 1322, 1325 (Fla. 1st DCA 1989).
This theme was also stated in McCarson, as follows:
Although this demand and the withholding of further benefits had tragic results, and although we must assume from the jury's verdict that it found Metropolitan was in reckless disregard of the potential for such tragedy, Metropolitan did no more than assert legal rights in a legally permissible way. As such, Metropolitan's actions are "privileged under the circumstances."
467 So.2d at 279.
In examining the activities of the bank in this regard in this case this court has determined that the activities so described and set forth in the ably prepared briefs of the parties did not rise to the level where the activity complained of was more than the assertion of legal rights the bank had within the trust agreement in a legally permissible way, and as such the bank's actions were, as in the Metropolitan's actions recited in McCarson, "privileged under the circumstances."
Neither did the actions of the bank reach the level of outrageous conduct contemplated under McCarson.
We determined this, even though the agreement in question was a trust agreement imposing a fiduciary relationship upon the actor in this case. No motive was actually displayed by any of the parties herein that would disclose a malevolent intent on the part of the bank or an insistence by the bank on rights in their trust agreement in other than a lawful permissible fashion. This conclusion requires that the final judgment entered by the court below be affirmed.
HERSEY, C.J., concurs in result only.
STONE, J., concurs.