905 So.2d 84 (2005)
Rodrigo AGUILERA, et ux., Petitioners,
v.
INSERVICES, INC., etc., et al., Respondents.
No. SC03-368.
Supreme Court of Florida.
June 16, 2005.
*86 Gary A. Friedman of Friedman & Friedman, Coral Gables, FL, and Lauri Waldman Ross of Lauri Waldman Ross, P.A., Miami, FL, for Petitioners.
Joshua D. Lerner and Rebecca A. Brownell of Rumberger, Kirk & Caldwell, Miami, FL, for Respondents.
Barbara B. Wagner of Wagenheim & Wagner, P.A., Fort Lauderdale, FL, for Amicus Curiae Florida Workers' Advocates.
Barbara Green of Barbara Green, P.A., Coral Gables, FL, and Diran V. Seropian of Caruso & Burlington, P.A., West Palm Beach, FL, for Amicus Curiae The Academy of Florida Trial Lawyers.
PER CURIAM.
We have for review Inservices, Inc. v. Aguilera, 837 So.2d 464 (Fla. 3d DCA 2002), which expressly and directly conflicts with and also misapplies our decision in Sibley v. Adjustco, Inc., 596 So.2d 1048 (Fla.1992).[1] We have jurisdiction pursuant *87 to article V, section 3(b)(3) of the Florida Constitution. See art. V, § 3(b)(3), Fla. Const.; see also Knowles v. State, 848 So.2d 1055, 1056 (Fla.2003) (accepting jurisdiction based on conflict created by misapplication of decisional law); Robertson v. State, 829 So.2d 901, 904 (Fla.2002) (stating that misapplication of decisional law creates conflict jurisdiction); Acensio v. State, 497 So.2d 640, 641 (Fla.1986) (accepting jurisdiction based on conflict created by misapplication of decisional law). We disapprove the decision under review for the reasons provided in our analysis below.

FACTS AND PROCEDURAL HISTORY
The present dispute arises from a decision of the district court of appeal which orders the trial court to dismiss this action based upon a workers' compensation insurance carrier's motion to dismiss asserting immunity under the Workers' Compensation Law, chapter 440 of the Florida Statutes (2000). See Inservices, 837 So.2d at 465. When presented with the insurance carrier's motion to dismiss, the trial court properly denied the motion as it was required to accept the factual allegations of the complaint as true and to consider those allegations and any inferences to be drawn therefrom in the light most favorable to Aguilera, the employee. See Siegle v. Progressive Consumers Ins. Co., 819 So.2d 732, 734-35 (Fla.2002). Accepting the employee's amended complaint as true, on April 21, 1999, Aguilera was injured in a warehouse when an electric fork lift operated by another employee struck him and pushed him against a pallet. Aguilera suffered immediate injuries to his back and right leg and he was transported to a local emergency room. The medical records reflect that, at the time, testing revealed that Aguilera had blood in his urine. He was examined by an emergency room physician and provided a prescription for medication.
Immediately following these injuries, Aguilera received medical care that was supervised and controlled by Managed Care USA Services, Inc., now known as Inservices, Inc., the workers' compensation insurance carrier, and its employees and agents. Pursuant to the insurance carrier's instruction, Aguilera was referred to a workers' compensation clinic and, on May 12, 1999, was discharged to return to limited work with restrictions.
Subsequently, Aguilera began to complain of kidney and bladder pain. On May 24, 1999, after examination by two physicians who both were of the medical opinion that he should not return to work, Aguilera's workers' compensation counsel filed an initial request for care, requesting authorization for Aguilera to be examined and treated by a board-certified urologist. The insurance carrier denied authorization for examination or treatment by a urologist, asserting that Aguilera's injury was not work-related. On June 17, 1999, the insurance carrier was again notified that urological care was needed now on an emergency basis because Aguilera's urine had allegedly begun to smell like feces. On June 21, 1999, Aguilera was advised that his workers' compensation benefits were being terminated as of July 9, 1999, notwithstanding the report of two doctors, including the opinion of the insurance carrier's own doctor, that he should not return to work.
On June 25, 1999, the insurance carrier intervened and actually blocked Aguilera's *88 receipt of medication which had been prescribed for him by the hospital emergency physician for his urinary condition. Allegations of this type of conduct of intervening and actually blocking receipt of needed prescribed medication cannot be minimized. On June 30, 1999, the insurance carrier again denied Aguilera's emergency request for the care of a urologist on the asserted basis that it was not medically necessary. At this time, the insurance carrier actually had within its possession medical documentation which both demonstrated the falsity of its position and clearly established the medical necessity for the care.
On July 7, 1999, the insurance carrier was advised by Aguilera's treating physician that his need for a urological consultation had become urgent and that his condition was deteriorating. On July 9, 1999, the insurance carrier's own doctor, Alan Dansky, issued Aguilera prescriptions for various urinary tests, and the appointments were in fact scheduled by the insurance carrier's nurse. However, on July 29, 1999, one of the insurance carrier's adjusters again intervened and simply unilaterally canceled some of this medical testing. Testing that was ultimately performed, specifically a retrograde urethrogram, revealed that Aguilera had a fistula, or a hole in his bladder.
On August 6, 1999, Mippy Heath commenced service as Aguilera's new case manager. Heath was specifically advised by Aguilera's attorney that there should be no direct contact with Aguilera, and the company representative agreed that no on-site intervention or case service would occur and no interference with Aguilera's care would be attempted.
On August 19, 1999, Aguilera's counsel alerted the insurance carrier that the injured employee was now in need of emergency surgery for the fistula. Heath refused authorization for the emergency surgery and insisted on a second opinion. On August 25, 1999, notwithstanding the specific agreement with Aguilera's attorney to the contrary, Heath secretly appeared at the physician's office for Aguilera's appointment with Dr. Campeatore, an IME (independent medical examiner) urologist. Heath again intervened and then urged Aguilera to lie to his counsel and to deceive his attorney by advising that she had not appeared at the doctor's office contrary to the true fact. This egregious conduct is not just a "common or ordinary part" of the process. Subsequently, Heath insisted that Aguilera submit to the administration of invasive tests that were not only painful to Aguilera but also contraindicated by his then-present medical condition. The insurance carrier then proceeded to use Aguilera's refusal to submit to these painful contraindicated testing procedures as a basis to justify a refusal and denial of his then needed critical, surgical treatment.
By November 4, 1999, Heath, the case manager, and a nurse practitioner also employed by the insurance carrier had changed positions and agreed that Aguilera needed immediate hospitalization for surgery. However, the insurance carrier's adjuster again intervened and overruled the decision of medical personnel simply because he wanted a second opinion from a general surgeon. Notwithstanding this intervention, the insurance carrier did not follow its own position and authorize Aguilera to consult with a general surgeon, but instead again changed course and sent Aguilera to a gastroenterologist. At this point in time, Aguilera had allegedly been urinating feces and blood for over six months.
Aguilera's ultimate surgery, the need for which had been diagnosed as an emergency as early as June of 1999, was not finally *89 authorized or approved until March 22, 2000. By this time, according to the allegations, Aguilera had been urinating feces and blood for over ten months. At the insurance carrier's insistence, Aguilera had been forced to be seen by no fewer than six doctors in addition to his initial treating physician. Each of the individuals who examined Aguilera concluded that his physical injuries were in fact related to the initial accident and that his condition as a result required urgent surgical treatment.[2]
The amended complaint set forth causes of action for common law bad faith, intentional infliction of emotional distress, breach of contract, and declaratory relief. The insurance carrier responded to these allegations with a motion to dismiss the complaint, asserting that workers' compensation immunity was applicable to bar all claims, both those initially resulting from the workplace injury and those alleged to have been independently and separately generated by the process. The trial court denied the insurance carrier's motion to dismiss, concluding that the intentional, outrageous conduct on the part of the insurance carrier had escalated to the point that a viable cause of action based in tort had been presented. See Inservices, 837 So.2d at 465.
The Third District recognized below that the workers' compensation scheme does not immunize an insurance carrier from wrongdoing that occurs independently of its claims handling. See id. at 466. The Third District incorrectly determined, however, that the allegations in the instant action merely concerned the manner in which Aguilera's claim was processed by the insurance carrier pursuant to the workers' compensation insurance contract, and, therefore, no independent tortious acts could ever be sufficiently alleged because they touched upon the claim process. See id. at 468. The court concluded, therefore, that because Aguilera's allegations were insufficient to establish any exception to the doctrine of statutory immunity provided by section 440.11 of the Florida Statutes (2000), the trial court had erred in its determination that the cause of action was not barred by the Workers' Compensation Law. See id. The district court reversed the trial court's decision and remanded with instructions to enter a final order dismissing the complaint and entering judgment in favor of the insurance carrier as a matter of law. See id. The essence of the decision below is that all acts and conduct, no matter how intentional, egregious or injurious, which occur during the claim process, are always afforded absolute immunity, a view we reject.
Aguilera seeks review of the Third District's decision, which we have granted. See Aguilera v. Inservices, Inc., 847 So.2d 975, 975 (Fla.2003) (table).

ANALYSIS
Workers' compensation laws provide employees limited medical and wage loss benefits, without regard to fault, for losses resulting from accidental workplace injuries in exchange for the employee relinquishing his or her right to seek common law recovery from the employer for those injuries. The obligation of an employer to provide workers' compensation benefits to employees at the time material here was presented in section 440.10(1)(a), Florida Statutes (2000), which provided, *90 "Every employer coming within the provisions of this chapter ... shall be liable for, and shall secure, the payment to his or her employees ... of the compensation payable [under this chapter]." In return for compliance with this requirement, section 440.11(1) provided, "The liability of an employer prescribed in s[ection] 440.10 shall be exclusive and in place of all other liability of such employer ... to the employee...." With regard to the liability of a worker's compensation insurance carrier, section 440.11(4) provided that "[n]otwithstanding the provisions of s[ection] 624.155, the liability of a carrier to an employee or to anyone entitled to bring suit in the name of the employee shall be as provided in this chapter, which shall be exclusive and in place of all other liability." Essentially, the system is designed for employers and insurance carriers to assume responsibility for limited amounts of medical and wage loss benefits resulting from workplace injuries without regard to fault in exchange for limitations on their liability, while the employee would correspondingly receive quick and efficient delivery of limited wage loss compensation and medical benefits. The workers' compensation system was never designed nor was it intended to act as a shield for those engaged in intentional conduct inflicting injuries upon workers through the benefit process itself. As expressly stated by the Legislature:
It is the intent of the Legislature that the Workers' Compensation Law be interpreted so as to assure the quick and efficient delivery of disability and medical benefits to an injured worker and to facilitate the worker's return to gainful reemployment at a reasonable cost to the employer. It is the specific intent of the Legislature that workers' compensation cases shall be decided on their merits. The workers' compensation system in Florida is based on a mutual renunciation of common-law rights and defenses by employers and employees alike.
§ 440.015, Fla. Stat. (2000). Fundamentally, the workers' compensation system establishes a system of exchange between employees and employers, as well as employees and insurance carriers, that is designed to promote efficiency and fairness. Our governing precedent, as well as that of our district courts, has recognized that under this no-fault system, the employee relinquishes certain common-law rights with regard to negligence in the workplace and workplace injuries in exchange for strict liability and the rapid recovery of benefits. Turner, 754 So.2d at 686; see also Eller v. Shova, 630 So.2d 537, 542 (Fla.1993); Fitzgerald v. South Broward Hosp. Dist., 840 So.2d 460, 462 (Fla. 4th DCA 2003); John v. GDG Servs., Inc., 424 So.2d 114, 116 (Fla. 1st DCA 1982); Clark v. Better Constr. Co., Inc., 420 So.2d 929, 931 (Fla. 3d DCA 1982).
It is clear that the scope of the mutuality provided in the compensation law does not give rise to blanket exclusivity and immunity which applies to all forms of conduct committed by employers and insurance carriers. To the contrary, the immunity extends only to "an accidental injury or death arising out of work performed in the course and the scope of employment." § 440.09(1), Fla. Stat. (2000) (emphasis supplied). Functionally, the workers' compensation system limits liability only for negligent workplace conduct which produces workplace injury, but does not extend to immunize intentional tortious conduct. See Turner, 754 So.2d at 687 ("[W]e reaffirm our prior decisions recognizing, as have our district courts and many jurisdictions around the country, that workers' compensation law does not protect an employer from liability for an intentional tort against an employee."). As this Court stated in Eller v. Shova, 630 *91 So.2d 537 (Fla.1993), "When employers properly secure workers' compensation coverage for their employees, employers are provided with immunity from suit by their employees so long as the employer has not engaged in any intentional act designed to result in or that is substantially certain to result in injury or death to the employee." Id. at 539; see also Sibley, 596 So.2d at 1050; Kline v. Rubio, 652 So.2d 964, 965 (Fla. 3d DCA 1995); Assoc. Indus. of Fla. Prop. & Cas. Trust v. Smith, 633 So.2d 543, 545 (Fla. 5th DCA 1994); Mirabal v. Cachurra Corp., 580 So.2d 285, 286 (Fla. 3d DCA 1991). Most assuredly, the system does not declare an "open season" with regard to intentional torts against workers.
The workers' compensation system was never designed or structured to be used by employers or insurance carriers as a sword to strike out and cause harm to individual employees during the claim process and then provide a shield from responsibility for an employee's valid intentional tort claim for that conduct through immunity flowing under the law. Most certainly, the workers' compensation system was never intended to function as a substitute for an employee's right to seek relief in a common law intentional tort action against an employer or insurance carrier, but was only intended to provide employers and insurance carriers with immunity for negligent workplace conduct which produced workplace injury. Minor delays in payments, and conduct amounting to simple bad faith in claim handling procedures of the employee's compensation claim have been captured within the immunity.[3] Today, we do not alter and recognize the continued viability of the cases holding that the mere delay of payments or simple bad faith in handling workers' compensation claims are not actionable torts, and that employees are not permitted to transform such simple delays into actionable torts cognizable in the circuit court. See, e.g., Sheraton Key Largo v. Roca, 710 So.2d 1016, 1017 (Fla. 3d DCA 1998) (stating an employee cannot avoid the exclusivity of the Workers' Compensation Law and transform a mere delay in payments into an actionable tort simply by calling that delay outrageous, fraudulent, deceitful, or an intentional infliction of emotional distress); Assoc. Indus. of Fla. Prop. & Cas. Trust v. Smith, 633 So.2d 543, 544 (Fla. 5th DCA 1994) ("Because Florida's compensation law contains mechanisms to insure timely payment and provides an array of sanctions which may be imposed when a carrier wrongfully withholds payment, the remedy under the act is exclusive."); Old Republic Ins. Co. v. Whitworth, 442 So.2d 1078, 1079 (Fla. 3d DCA 1983) (determining that while the employee alleged a bad faith refusal to timely compensate him for his disabilities, the complaint did not allege that the insurance carrier intentionally harmed the employee).
The allegations here simply go far beyond simple claim delay or a simple termination *92 of benefits. The complaint specifically alleges harm caused subsequent to and distinct from the original workplace injury. The statutes do not contemplate and this Court has never permitted compensation insurance carriers to cloak themselves with blanket immunity in circumstances where the carrier has not merely breached the duty to timely pay benefits, or acted negligently, but has actually committed an intentional tort upon an employee. See Sibley v. Adjustco, Inc., 596 So.2d 1048 (Fla.1992); Turner, 754 So.2d at 686; Eller, 630 So.2d at 539; see also Assoc. Indus. of Fla. Prop. & Cas. Trust, 633 So.2d at 545 ("If a workers' compensation carrier has not merely breached the duty to timely pay benefits but has committed an independent tort against a claimant, the plaintiff may pursue his cause of action in circuit court."). Under Florida law, we have recognized the tort of intentional infliction of emotional distress where a party's conduct is more than simply bad faith or a breach of contract, but where the defaulting party's intentional conduct is outrageous. See Metro. Life Ins. Co. v. McCarson, 467 So.2d 277, 278-79 (Fla.1985) (recognizing the tort of intentional infliction of emotional distress where the facts are "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency"); see also Dominguez v. Equitable Life Assurance Soc'y of the United States, 438 So.2d 58 (Fla. 3d DCA 1983), approved, 467 So.2d 281 (Fla.1985). The decision below and the dissent would expand immunity far beyond that ever recognized in Florida. The dissent is simply incorrect in suggesting that Florida does not recognize a freestanding tort under claim process circumstances. A freestanding independent tort action has been recognized and authorized for more than twenty years in Florida.
In recognizing that an employee has retained the right to present an independent tort action against an insurance carrier, this Court has acknowledged that employees are not permitted to simply transform a simple delay in payments into an actionable tort cognizable in circuit court. See Old Republic Ins. Co., 442 So.2d at 1079. However, we are confident that Florida courts have been and will continue to be able to analyze an employee's allegations and ascertain whether the allegations amount to a mere delay in payments, simple bad faith, or truly rise to the level of a separate and independent intentional tort. For example, in Sullivan v. Liberty Mutual Insurance Co., 367 So.2d 658, 661 (Fla. 4th DCA 1979), the Fourth District addressed the extreme difference between an insurance carrier's minor delays and conduct intentionally causing harm to a claimant. The Sullivan court reasoned that if "minor delays in getting medical service, such as for a few days or even a few hours, caused by a carrier, could become the bases of independent suits" then "the objective of the Legislature and the whole pattern of workmen's compensation could thereby be partially nullified." Id. at 661 (quoting Noe v. Travelers Ins. Co., 172 Cal.App.2d 731, 342 P.2d 976, 979-80 (1959)). Moreover, Florida courts are already required to make this distinction in the insurance debtor/creditor context. See, e.g., Greene v. Well Care HMO, Inc., 778 So.2d 1037, 1042 (Fla. 4th DCA 2001) (discussing in the insured/insurer context the difference between causes of action for bad faith and breach of contract and those related to allegations of an independent tort such as fraud or intentional infliction of emotional distress); Rubio v. State Farm Fire & Cas. Co., 662 So.2d 956, 957 (Fla. 3d DCA 1995) (same); Ford Motor Credit Co. v. Sheehan, 373 So.2d 956, 958 (Fla. 1st DCA 1979) (affirming a verdict assessing *93 damages where debtor sued creditor for intentional infliction of mental distress). Today, we reaffirm that the workers' compensation legislation does immunize an insurance carrier for mere negligent conduct, simple bad faith, and minor delays in payment, but does not afford blanket immunity for all conduct during the claim process, particularly the insurance carrier's intentional tortious conduct such as that presented in this case.
As we turn to the issue in this case involving the scope of an insurance carrier's liability in the context of intentional torts, we reject the notion and premise of the Third District and that favored by the dissent, that an independent tort in this context can never exist within the claims administration process and that for an independent claim to have validity, it must be an act totally separate and apart from the process itself. Such premise is invalid as reflected in our decision in Sibley v. Adjustco, Inc., 596 So.2d 1048 (Fla. 1992), a decision the dissent attempts to distinguish. The Third District referred to Sibley but incorrectly analyzed its impact and misapplied its holding.
In Sibley, the insurance carrier's intentional tortious actions actually occurred during the claims process and did not involve acts or conduct totally separate and independent of the workers' compensation claim process. Specifically, the insurance carrier there edited material aspects of the employee's statements obtained during the processing and handling of the workers' compensation claim, and based in part on the insurance carrier's fraudulent acts, the carrier had refused to timely pay the employee workers' compensation benefits. See 596 So.2d at 1050. At that time the applicable workers' compensation statute provided the identical immunity and exclusivity as contained in the statute applicable here. This Court specifically held that the employee in that instance, notwithstanding his right to process a statutory claim under the Workers' Compensation Law with the insurance carrier, could also file and maintain an independent common law action in tort against the insurance carrier based on the intentional fraudulent acts committed during the claims process itself. See id. at 1050-51. The dissent presents a statutory analysis argument that ignores the important holding of Sibley as even recognized in the decision below. The dissent also fails to recognize that the identical immunity was in the statute when Sibley was decided as is present in this case.
In this case, the Third District has interpreted Sibley to hold that an independent action against an insurance carrier is only available when the intentional tort occurs totally independent of the handling or processing of a workers' compensation claim. It is incorrect to reason that the tortious conduct must absolutely be "independent of the workers compensation claim" itself because without the existence of the claims process these two parties, the employee and insurance carrier, would have never been in contact. See Inservices, 837 So.2d at 467 (emphasis supplied). The district court erred in utilizing the yardstick by which it measured the sufficiency of Aguilera's complaint with regard to whether his allegations stated a viable common law cause of action for an intentional tort against the insurance carrier. The Third District should not have limited itself to considering whether Aguilera's allegations involved wrongdoing totally separate and independent of the workers' compensation claim process itself. See id. Pursuant to Sibley, if an insurance carrier engages in outrageous actions and conduct that constitutes an intentional tortious act while *94 processing the claim beyond mere short delays in payment and simple bad faith, the carrier is not cloaked with a shield of immunity flowing from the workers' compensation provisions.
Both Sibley and the instant case involve insurance carriers which, in the process of administering benefits, intentionally injured a workerthis is not the conduct for which the workers' compensation system was designed to afford immunity. In both Sibley and this case, the injuries at issue did not occur at the workplaceworkplace injuries are covered under the workers' compensation systembut the injuries were allegedly inflicted by an insurance carrier during the claims handling process. The dissent mistakenly asserts that there is no conflict between Sibley and the district court's decision below because "Sibley addresses only the question of exclusivity as it relates to section 440.37 ... [which] has long since been repealed and is entirely irrelevant to Aguilera's specific claim." Dissenting op. at 106. This conclusion is not supported. The material operative facts are identical. Both Sibley and the instant case involve insurance carriers that intentionally harmed workers in the claims administration process. The identical statutory immunity existed at the time of Sibley as existed at the time of Aguilera's injuries. In analyzing the alleged conduct, the Sibley Court distinguished between the statutory cause of action provided by the Legislature in section 440.37 and the common law action for an intentional tort, recognizing that the Legislature did not intend to eliminate such common law rights of action. See 596 So.2d at 1050-51. This Court specifically held:
[T]hose statutory provisions were not intended to bar recovery for intentional tortious conduct. Byrd v. Richardson-Greenshields Sec., Inc., 552 So.2d 1099 (Fla.1989); Fisher v. Shenandoah Gen. Constr. Co., 498 So.2d 882 (Fla.1986); Lawton v. Alpine Eng'red Prods., Inc., 498 So.2d 879 (Fla.1986). Given the distinctive characteristics of this statutory action and the common law action, we conclude that the legislature was providing an alternative cause of action and not eliminating a common law right of action for an intentional tort.

596 So.2d at 1050-51 (emphasis supplied and footnote omitted). Significantly, the Sibley Court specifically concluded that the Legislature through the statutory provisions in the workers' compensation statute was "not eliminating a common law right of action for an intentional tort." Id. at 1051. In stating that statutory provisions of the workers' compensation statute were not intended to bar recovery for intentional tortious conduct, the Sibley Court was not limiting its decision to section 440.37, which is apparent from its citations to Byrd, Fisher, and Lawton. See Byrd, 552 So.2d at 1100 (holding that the workers' compensation statute does not provide the exclusive remedy for a claim based on sexual harassment in the workplace); Fisher, 498 So.2d at 884 (holding that an employer does not commit an intentional tort when he orders his employee to work inside a pipe which the employer knows to be filled with dangerous gas that will in all probability result in injury to the employee); Lawton, 498 So.2d at 880 (holding that an employer does not commit an intentional tort when he instructs his employee to operate dangerous machinery without warning the employee about the machinery's known hazards). In Sibley, therefore, this Court reaffirmed a worker's common law right of action for an intentional tort where an insurance carrier has engaged in intentional harmful acts while administering the claim, notwithstanding the workers' compensation scheme.
*95 In Inservices, the Third District is in conflict with and misapplied this Court's holding in Sibley by incorrectly concluding that the workers' compensation scheme does immunize a compensation carrier from wrongdoing which occurs during its claim process. Sibley in fact stands for the proposition that the workers' compensation system does not immunize a workers' compensation carrier from any intentional acts of wrongdoing and does not limit a carrier's accountability for their intentional misconduct exclusively to intentional acts occurring independently of the claims handling process. We have clearly concluded that the workers' compensation system does not immunize an insurance carrier's intentional fraudulent actions while processing a claim, and this holding has clear application where an insurance carrier allegedly intentionally causes additional injuries to workers while administering the worker's workplace injury claim. See Sibley, 596 So.2d at 1050. Thus, contrary to the dissenting view, this Court must address this direct conflict created by the Third District's opinion and its misapplication of our holding in Sibley. See Robertson v. State, 829 So.2d 901, 904 (Fla. 2002) (stating that misapplication of decisional law creates conflict jurisdiction).
Our assessment of the misinterpretation of Sibley below is not intended to nor does it discredit the long-established rule that the conduct alleged by an employee must rise to the level tantamount to intentional tortious conduct to preclude an insurance carrier from prevailing with statutory immunity. An employee's complaint must, indeed, allege conduct that is or is tantamount to an independent tort. See Wausau Ins. Co. v. Haynes, 683 So.2d 1123, 1125 (Fla. 4th DCA 1996); Assoc. Indus. of Fla. Prop. & Cas. Trust, 633 So.2d at 546; Old Republic, 442 So.2d at 1079; Sullivan, 367 So.2d at 661. Therefore, we turn to the sufficiency of Aguilera's complaint in this action, specifically whether Aguilera has alleged facts which constitute a cause of action against the workers' compensation insurance carrier for intentionally harming him which would preclude application of statutory immunity under the Workers' Compensation Law.
The district court below held that Aguilera had not sufficiently alleged a cause of action against the insurance carrier for intentionally harming him. According to the district court:
Here, all of Aguilera's allegations deal with the manner in which his claim was handled by the [insurance carrier] pursuant to the workers' compensation insurance contract. Since all of the allegations relate to the [insurance carrier's] alleged breach of contractual obligations under the workers' compensation policy, no independent acts have been alleged and thus there is no independent tort. See Sullivan v. Liberty Mut. Ins. Co., 367 So.2d at 658. Aguilera's injuries arising from any delays in medical treatment were incidental to his original injury and compensable by his employer's compensation carrier. See Old Republic Ins. Co. v. Whitworth, 442 So.2d at 1079.
Inservices, 837 So.2d at 468 (footnote omitted). The Third District erred in holding that statutory immunity was applicable as a matter of law, because the egregious conduct flows from the claim process itself.
This case is before the Court based on the district court's decision that the workers' compensation insurance carrier's motion to dismiss the complaint must be granted and the action dismissed with prejudice. As we have stated, in reviewing the district court's decision, we do so from the perspective of viewing Aguilera's complaint in a light most favorable to him, and must consider all facts and reasonable *96 inferences to his advantage. See Hearndon v. Graham, 767 So.2d 1179, 1182 (Fla. 2000); see also Gladstone v. Smith, 729 So.2d 1002, 1003 (Fla. 4th DCA 1999) (stating that when considering the merits of a motion to dismiss, facts alleged in the complaint must be accepted as true, and all reasonable inferences must be drawn in favor of the pleader); Clark v. Gumby's Pizza Sys., Inc., 674 So.2d 902, 904 (Fla. 1st DCA 1996) ("In reviewing an order granting a motion to dismiss for failure to state a cause of action, an appellate court must assume that all material factual allegations are true and must draw all reasonable inferences in favor of the pleader."). Here, Aguilera clearly alleged a pattern of intentional, outrageous and harmful conduct that would serve to establish the existence of an independent tort. The insurance carrier not only denied Aguilera any authorization for urological treatment, claiming it was not work-related; advised Aguilera that his workers' compensation benefits were being terminated, notwithstanding the report of two doctors to the contrary, including the insurance carrier's own physician, that he should not return to work; but actually blocked Aguilera's receipt of prescription medication prescribed to him by the hospital emergency physician for his serious urinary tract condition. The carrier not only denied Aguilera's emergency request for the care of a urologist on the basis that it was not medically necessary, notwithstanding that at that time, the insurance carrier actually had within its possession medical care information to the contrary showing that it was necessary, the insurance adjuster even unilaterally canceled medical testing prescribed by its own physician. Aguilera's case manager not only refused to authorize necessary emergency care, but insisted on a second opinion, and notwithstanding her agreement with Aguilera's attorney, actually intervened and attended Aguilera's urological appointment with Dr. Campeatore, and then not only violated the prohibition of contacting a represented person but outrageously urged Aguilera to lie to his own counsel about her presence. The case manager proceeded to insist on the administration of tests that were both painful to Aguilera and contraindicated by his then-present medical condition. Finally, the insurance carrier precluded Aguilera's surgery, diagnosed as an emergency in June of 1999, until March 22, 2000, by which time Aguilera had been urinating feces and blood for over ten months. Measured by the standards of human decency and societal expectations, one would certainly cry "outrageous" in the face of this conduct. In the words of the dissent, just a "common or ordinary part" of a claim processwe think not.
In addition to alleging all of the acts above, Aguilera specifically alleged in his amended complaint that the insurance carrier "did everything in [its] power to block medical treatment that it had actual notice [Aguilera] needed, and by doing so recklessly endangered [Aguilera's] life, and engaged in a pattern of action substantially certain to bring about his death." (Emphasis supplied.) This is the conduct that adoption of the dissenting view would shield from responsibility as just part of the "bargained for balance." Aguilera's allegations clearly do not involve a mere delay in payments or simple bad faith, but, at a minimum, allege intentional misconduct that was substantially certain to harm Aguilera. The conduct alleged by Aguilera is, most certainly, sufficient to establish an independent tort. See Metro. Life Ins. Co. v. McCarson, 467 So.2d 277, 278-79 (Fla.1985) (recognizing the tort of intentional infliction of emotional distress where the facts are "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency"). At a minimum, *97 the allegations of Aguilera's complaint that the insurance carrier "engaged in a pattern of action substantially certain to bring about his death," together with the supporting outline of outrageous and egregious facts, most assuredly withstands a motion to dismiss on the basis that workers' compensation immunity would bar the action as a matter of law. Whether Aguilera can actually prove the facts as alleged during a trial is a far different issue than we decide today as our decision must be based upon an acceptance of the facts alleged as true in the present procedural posture.
Here, the allegations reflect individuals using the power of the insurance carrier and its position of authority to affirmatively inflict damage upon Aguilera separate from and in addition to the initial workplace injury. Certainly, the facts demonstrate that Aguilera was placed at the mercy of the carrier and misdirected representatives at every step of the process. The insurance carrier's actions here go beyond a mere delay in payments or simple bad faith. The complaint outlines intentional behavior by the insurance carrier, the insurance carrier's case manager, an adjuster and others, who all went to the extent of even invading the privacy of Aguilera's medical appointments, and then having the audacity to suggest and actively encourage that Aguilera lie to his counsel and conceal the true facts. Contrary to the dissent, we simply cannot sanction the behavior and conduct alleged here as being acceptable "standard" claims practices according to societal norms. The cases upon which the dissent attempts to rely are not at all applicable to the conduct alleged here. We cannot place a cloak of immunity around this conduct and to do so would be a one-sided perversion of that which has been contemplated by our legislature in our workers' compensation system. Indeed, it would be inconceivable to characterize this intentional behavior of the insurance carrier, which includes invasion of privacy and encouragement to lie and erode the attorney-client relationship, as a simple delay in payment.
The dissent asserts that the majority's decision will "severely erode[ ]" the workers' compensation doctrine of exclusivity. Dissenting op. at 105. To the contrary, the present case demonstrates, under the allegations presented here, a compensation process gone awry for which no immunity was ever designed or intended by the workers' compensation act. The majority is not eroding the doctrine of immunity in this case because this immunity was never intended to apply to the facts such as these. The workers' compensation system was designed for work-related injuries, not for injuries intentionally caused by an insurance carrier during the administration of the worker's work-related injury claim. We cannot ignore facts or mischaracterize that which allegedly occurred as being a simple delay and termination of benefits. These facts, if proven, exemplify how a workers' compensation system should not operate. The present case is not merely a simple delay of payment but a situation in which an insurance carrier has exacerbated Aguilera's situation by conduct that caused further subsequent and distinct injury in addition to his injury at the workplace.
Finally, we recognize the strong feelings and strong objections voiced by the dissent but find them misdirected here. The worker's compensation system was designed and intended as a mechanism to fairly and equitably resolve workplace injuries and it was never contemplated that it would operate as a system to inflict injuries on workers during the administration process with absolute immunity. We must be concerned with upholding the system as intended and fairly protecting the *98 rights of all parties involved, not just the immunization of insurance companies from responsibility for egregious intentional contact.
Although the dissent voices the view that a worker subjected to abuses such as these would find relief in section 440.25(4)(h) of the Florida Statutes (2000), see dissenting op. at 104, it fails to consider that this provision addresses procedures for mediation and hearings that are available after a petition for benefits is filed under section 440.192. As well reasoned by Judge Shevin below, there are no statutory remedies in place and available to address the core situation presented and the subsequent, distinct injuries:
[T]he imposition of criminal penalties on the carrier, suspension of the carrier's license, penalties for late payments, attorney's fees, dispute resolution procedures, or further procedures to dispute IME requests may punish the carrier or expedite a claim process but those measures do not compensate Aguilera for the injuries he suffered as a result of the carrier's intentional wrongful acts. The carrier's actions including alleged lies as to available benefits, refusal to schedule physician appointments, attempts to deprive him of medical care, and insistence upon tests contraindicated by his medical condition amount to intentional wrongful actions distinct from its breach of contract.
Inservices, 837 So.2d at 472 (Shevin, J., dissenting in part, concurring in part). The allegations here do not involve a simple benefit dispute. Aguilera's complaint provides allegations of conduct rising to the level of intentional infliction of additional injuries by an insurance company. Section 440.25 is not an available optional procedure that provides relief or compensation for these separate and distinct injuries inflicted. No emergency hearing would have provided Aguilera a remedy for the intentional tortious acts committed by the insurance carrier, as alleged in his amended complaint, or the injuries he allegedly sustained. An emergency hearing was never intended to be a remedy for the injuries resulting from outrageous circumstances as alleged in this case.
We reiterate today that, notwithstanding the immunity the workers' compensation system provides for workplace injuries negligently inflicted, our Workers' Compensation Law was never designed or intended to eliminate a common law right of action for intentional tortious conduct. An insurance carrier who utilizes the process of administering benefits to intentionally injure a worker is not afforded immunity. Only injuries that occur within the system, "workplace injuries," are covered under the workers' compensation law, not injuries intentionally inflicted by an insurance carrier during the claims administration process.

CONCLUSION
We express no opinion with regard to the ultimate outcome of these allegations at trial. We simply hold that here the allegations presented in the pleading collectively are sufficient to preclude a dismissal under a theory of immunity as a matter of law. Accordingly, we disapprove Inservices, Inc. v. Aguilera, 837 So.2d 464 (Fla. 3d DCA 2002), to the extent of conflict with Sibley and the reasoning presented in this opinion, quash the district court's decision, and remand with instructions to return the case to the trial court for further proceedings.
It is so ordered.
PARIENTE, C.J., and ANSTEAD, LEWIS and QUINCE, JJ., concur.
WELLS, J., dissents with an opinion, in which CANTERO and BELL, JJ., concur.
*99 BELL, J., dissents with an opinion, in which WELLS and CANTERO, JJ., concur.
WELLS, J., dissenting.
I join in Justice Bell's well-reasoned opinion. On the merits of this claim, I believe it to be a mistake for this Court to diminish the effectiveness of the bar to common law tort actions that are integral to workers' compensation actions. The effects of the majority's decision will be to allow the pleading around of the exclusive remedy and undermining of the quid pro quo upon which the Legislature founded the workers' compensation system. This Court refused a similar attempt to use intentional emotional distress to be a basis for a cause of action in delayed payment of insurance benefits in Metropolitan Life Insurance Co. v. McCarson, 467 So.2d 277, 279 (Fla.1985). See also Baker v. Fla. Nat'l Bank, 559 So.2d 284, 288 (Fla. 4th DCA 1990). I believe we should apply the law of these wise decisions in this case.
I would, however, not reach the merits of this case because Justice Bell is clearly correct that the present decision of the Third District Court of Appeal does not conflict with this Court's decision in Sibley v. Adjustco, Inc., 596 So.2d 1048 (Fla. 1992). The decisions were plainly on different facts. This is important in respect to this Court's jurisdiction because the majority does not find that there is a conflict in the rule of law of the two cases but, rather, bases jurisdiction upon misapplication conflict.
Misapplication conflict is a narrow constitutional basis for this Court's jurisdiction. Article V, section 3(b)(3), Florida Constitution, only provides for jurisdiction for any decision of a district court "that expressly and directly conflicts with a decision of another district court of appeal or of the supreme court on the same question of law." The Constitution does not use the words "misapplication jurisdiction."
Misapplication conflict jurisdiction was discussed and limited from the time of the creation of the courts of appeal in 1957. In the landmark opinion of Ansin v. Thurston, 101 So.2d 808, 811 (Fla.1958), Justice Drew, writing for this Court, stated:
A limitation of review to decisions in "direct conflict" clearly evinces a concern with decisions as precedents as opposed to adjudications of the rights of particular litigants.
Similar provisions in the court systems of other states have been so construed: "A conflict of decisions ... must be on a question of law involved and determined and such that one decision would overrule the other if both were rendered by the same court; in other words, the decisions must be based practically on the same state of facts and announce antagonistic conclusions." 21 C.J.S. Courts § 462.
In Nielsen v. City of Sarasota, 117 So.2d 731, 734-35 (Fla.1960), Justice Thornal wrote for this Court:
We do not here suggest that if we had been charged with the responsibility of the Court of Appeal in the instant case we would have arrived at the same conclusion which they reached. In fact, it is altogether possible that we might have arrived at an entirely different conclusion as to the ultimate effect of the circumstantial evidence and the justifiable inferences to be drawn therefrom. Cf. Majeske v. Palm Beach Kennel Club, [117 So.2d 531 (Fla. 2d DCA 1959).] Such a difference of view, however, is not the measure of our appellate jurisdiction to review decisions of Courts of Appeal because of alleged conflicts with prior decisions of this Court on the same point of law.

*100 While conceivably there may be other circumstances, the principal situations justifying the invocation of our jurisdiction to review decisions of Courts of Appeal because of alleged conflicts are, (1) the announcement of a rule of law which conflicts with a rule previously announced by this Court, or (2) the application of a rule of law to produce a different result in a case which involves substantially the same controlling facts as a prior case disposed of by this Court. Under the first situation the facts are immaterial. It is the announcement of a conflicting rule of law that conveys jurisdiction to us to review the decision of the Court of Appeal. Under the second situation the controlling facts become vital and our jurisdiction may be asserted only where the Court of Appeal has applied a recognized rule of law to reach a conflicting conclusion in a case involving substantially the same controlling facts as were involved in allegedly conflicting prior decisions of this Court. Florida Power & Light Co. v. Bell, 113 So.2d 697 (Fla. 1959).
....
When our jurisdiction is invoked pursuant to this provision of the constitution we are not permitted the judicial luxury of upsetting a decision of a Court of Appeal merely because we might personally disagree with the so-called "justice of the case" as announced by the Court below. In order to assert our power to set aside the decision of a Court of Appeal on the conflict theory we must find in that decision a real, live and vital conflict within the limits above announced.
(Emphasis added.) This analysis was followed and reaffirmed in Mancini v. State, 312 So.2d 732, 733 (Fla.1975):
Our jurisdiction cannot be invoked merely because we might disagree with the decision of the district court [or] because we might have made a factual determination if we had been the trier of fact, Kincaid v. World Insurance Co., 157 So.2d 517 (Fla.1963). As pointed out in Nielsen v. City of Sarasota, Fla., 117 So.2d 731, our jurisdiction to review decisions of courts of appeal because of alleged conflicts is invoked by (1) the announcement of a rule of law which conflicts with a rule previously announced by this court or another district, or (2) the application of a rule of law to produce a different result in a case which involves substantially the same facts as a prior case. In this second situation, the facts of the case are of the utmost importance.

(Emphasis added.) Therefore, in our historic precedent we limited "misapplication jurisdiction" to cases which involve "substantially the same controlling facts" as a prior case disposed of by this Court.
Sibley does not involve "substantially the same controlling facts." This Court set out the facts in Sibley to be:
Sibley's complaint alleged that, while he was hospitalized in a heavily sedated condition, his statement was taken by William Adams, an employee of the workers' compensation carrier. Furthermore, Sibley claimed that the statement taken by Adams was inaccurate and had been edited in material respects and that, because of Adams' fraudulent acts, the carrier refused to pay Sibley workers' compensation benefits. Sibley's complaint charged that such acts were intentional misconduct and not negligent conduct protected by chapter 440, Florida Statutes (1989).
596 So.2d at 1050. In Sibley, this Court expressly stated that the case was a tort *101 action by an employee who claimed to have been defrauded. Id.
In the present case, the district court set out these facts:
Aguilera was injured in a work-related accident when he was struck by an electric fork lift in April of 1999. Inservices referred Aguilera to a workers' compensation clinic where he was treated and eventually discharged to return to work with restrictions.
A few weeks later, Aguilera began to complain of kidney and bladder pain. After examination by two doctors who both recommended that Aguilera not return to work, Aguilera's workers' compensation attorney requested examination and treatment by a board certified urologist. Inservices denied the request claiming the injury was not work-related.
In June of 1999, Aguilera notified Inservices that he was passing feces through his urine and was in need of immediate urological care. Three days later, Aguilera was advised that his workers' compensation benefits were being terminated. Inservices denied the emergency request for medical care claiming it was not medically necessary.
Several weeks later, Aguilera's treating physician again advised Inservices that the need for urological care was urgent and that his condition had deteriorated. The results of a retrograde urethogram revealed Aguilera had a hole in his bladder. A new case manager was assigned to Aguilera's case, defendant/appellee Mippy Heath ("Heath"), however, Heath rejected Aguilera's request that a general surgeon perform immediate emergency surgery on his fistula. She insisted on a second opinion and the administration of tests which, according to Aguilera, were painful and contraindicated by his medical condition. Heath thereafter sent Aguilera to a gastroenterologist.
After seeing six doctors in addition to his initial treating physician, and after urinating feces and blood for over ten months, Aguilera's surgery was authorized on March 22, 2000. Aguilera filed suit against the defendants, seeking damages for common law bad faith and breach of contract against Inservices, for intentional infliction of emotional distress against Inservices and Heath, and seeking a declaration that the workers' compensation exclusivity rule is unconstitutional to the extent it eliminates claims for subsequent malfeasance of a carrier.
837 So.2d at 465.
We have repeatedly held that conflict between decisions must appear within the four corners of the majority decisions. Neither a dissenting opinion nor the record itself can be used to establish jurisdiction. Reaves v. State, 485 So.2d 829 (Fla. 1986). When placed side-by-side, the facts set out in Sibley and the facts set out in the majority opinion in the district court in this case simply do not meet the standard for "misapplication jurisdiction" required by this Court's historical precedent.
Obviously, this is a case about which the present majority in this Court and Judge Shevin in the district court feel very strongly. I respect those feelings. But it was precisely about our not having the power to take cases on bases upon which we conclude the district court was wrong or that an injustice had been done that this Court's historic precedent instructs and informs. I believe we must have the self-discipline to adhere to these teachings, for they are the very foundation upon which our Court system is built.
CANTERO and BELL, JJ., concur.
*102 BELL, J., dissenting.
I dissent from the majority opinion for two reasons. First, we do not have jurisdiction to take this case. The decision of the Third District in Inservices, Inc. v. Aguilera, 837 So.2d 464 (Fla. 3d DCA 2002), does not expressly and directly conflict with the question of law we answered in Sibley v. Adjustco, Inc., 596 So.2d 1048 (Fla.1992). Second, on the merits, I agree with the Third District that the exclusivity provisions of the workers' compensation statute bar Aguilera from filing an independent tort claim for intentional infliction of emotional distress arising directly out of a claims handling dispute.
Because this decision will have serious, adverse impact upon a compensation scheme that is so vital to the people of this state, I will address the substantive question of exclusivity first. I will then explain our lack of jurisdiction in this case.

I. EXCLUSIVITY OF THE WORKERS' COMPENSATION STATUTE
As the Third District properly concluded, Aguilera's independent claim is barred by the Workers' Compensation Act. In exchange for a renunciation of common law rights and defenses, the Act provides relief mechanisms specifically designed to remedy claims-handling difficulties such as those experienced by Aguilera. Inexplicably, he never pursued these statutory remedies. The majority does not view Aguilera's complete neglect of these statutory remedies as any barrier to pursuing an independent tort claim. I strongly disagree. The exclusivity of the Workers' Compensation Act is critical to its efficacy. Allowing Aguilera to ignore these statutory remedies and to proceed with an independent action further erodes the doctrine of exclusivity and unnecessarily undermines the workers' compensation scheme.

A. The Exchange of Common Law Remedies for Statutory Remedies
"The workers' compensation system in Florida is based on a mutual renunciation of common-law rights and defenses by employers and employees alike." § 440.015 Fla. Stat. (2000). As the majority states, Florida's workers' compensation immunity protects an employer from most work-related tort lawsuits, but the exclusivity provision of section 440.11 does not insulate an employer from intentional tort lawsuits brought by employees. In other words, "employers are provided with immunity from suit by their employees so long as the employer has not engaged in any intentional act designed to result in or that is substantially certain to result in injury or death to the employee." Eller v. Shova, 630 So.2d 537, 539 (Fla.1993). Workers' compensation carriers enjoy the same immunity. See § 440.11(4), Fla. Stat. (2000). As the district court in Aguilera stated, an exception for "carrier immunity" under the Act exists where the carrier commits an intentional tort that is independent of a breach of its contractual claims-handling obligations. See Aguilera, 837 So.2d at 467; see also Associated Indus. of Fla. Prop. & Cas. Trust v. Smith, 633 So.2d 543, 545 (Fla. 5th DCA 1994). This is so because an independent tort requires proof of facts separate and distinct from a breach of contract. See HTP, Ltd. v. Lineas Aereas Costarricenses, S.A., 685 So.2d 1238 (Fla.1996).
Relying on Turner v. PCR, Inc., 754 So.2d 683 (Fla.2000), and Sibley, Aguilera alleges that the actions of his employer's workers' compensation carrier constituted an intentional tort outside the scope of the Workers' Compensation Act. Aguilera's amended complaint pleads causes of action for common-law bad faith, intentional infliction *103 of emotional distress, breach of contract, and declaratory relief.
The factual basis for Aguilera's claims is that Inservices engaged in improper claims-handling delay and wrongful termination of benefits. Obviously, a workers' compensation carrier is entitled, under appropriate circumstances, to require a claimant to obtain second opinions or to terminate benefits. Therefore, disputes over delays or termination of benefits are an inevitable part of the claims-handling process. However, if the delays are inappropriate or the termination of benefits is wrongful, a claimant must have appropriate remedies. And the Act contains such remedies. It expressly provides for remedies against carriers who engage in unnecessary delays or wrongful termination of benefits. And, until today, these remedies were considered exclusive unless a tort truly independent of the claims handling process was committed.[4]
The majority relies on Sibley to support its decision to allow Aguilera to escape the exclusivity of the Act. Admittedly, Sibley can logically be extended to include Aguilera's claim. However, I believe Sibley and Aguilera are also logically and prudently distinguishable on their facts. In Sibley, it was alleged that the claims adjuster committed fraud by altering Sibley's statements. Of course, unlike a claim denial or termination of benefits, fraud is not a common or ordinary part of the claims-handling process. Though a carrier may deny a claim or terminate benefits, a carrier is never entitled to defraud a claimant in the course of a claims-handling dispute. Therefore, fraud by a claims adjuster is clearly independent of the standard workers' compensation claims handling process. Unlike the tort alleged in Sibley, I agree with the Third District that the tort alleged by Aguilera is not sufficiently independent of a dispute over whether Inservices has breached its contractual claims-handling obligations to allow an exception for "carrier immunity" under the Act. Aguilera has not alleged that Inservices committed fraud or any other such well-defined, intentional tort one can clearly differentiate from the claims-handling process. Instead, he alleges the more nebulous tort of intentional infliction of emotional distress. This tort is so closely intertwined with the claims-handling process that, unlike the clearly defined tort of fraud, one would be hard-pressed to determine at what point a claims-handling dispute (that must be resolved within the Act) gives birth to the separate, independent tort of intentional infliction of emotional distress. This is particularly true when the claimant chooses to ignore the emergency relief the Act provides to expeditiously resolve the increasing distress a carrier may be causing by its handling of a claim or its decision to terminate benefits. For these reasons, I believe Sibley and Aguilera are both logically and prudently distinguishable.

B. Statutory Remedies
I do agree with the majority that Aguilera's medical condition set out as the basis for his claim was extremely serious. If true, the allegations he makes about the carrier's handling of his claim clearly demonstrate *104 improper claims handling. However, as the district court discussed in its well-reasoned opinion, Aguilera could have sought immediate relief pursuant to the many applicable provisions of the Workers' Compensation Act.[5] As I have said, Aguilera inexplicably ignored these remedies. Aguilera could have filed for an emergency medical hearing before the judge of compensation claims pursuant to section 440.25(4)(h), Florida Statutes (2000), and Florida Rules of Workers' Compensation Procedure 4.065(d) and 4.095. This judge could have held an emergency conference and entered an order providing Aguilera with the expeditious relief he claims Inservices unreasonably denied him. Section 440.25(4)(h) states:
Notwithstanding any other provision of this section, the judge of compensation claims may require the appearance of the parties and counsel before her or him without written notice for an emergency conference where there is a bona fide emergency involving the health, safety, or welfare of an employee. An emergency conference under this section may result in the entry of an order or the rendering of an adjudication by the judge of compensation claims.
In addition to this emergency relief, section 440.20, Florida Statutes (2000), sets a deadline for the timely payment of compensation claims and establishes penalties for late payments. And section 440.192, Florida Statutes (2000), provides a procedure for resolving any benefit disputes between a carrier and a claimant and sets strict deadlines for dispute resolution.
So, assuming that Aguilera's allegations are true, had he taken advantage of these procedures, the Act entitles him to prompt, emergency relief. Yet, there is no allegation or evidence that Aguilera ever sought relief under section 440.25(4)(h) or any other provision of the Act.[6] And, instead of being required to avail himself of the remedies expressly provided by the Act to expeditiously resolve his problems with Inservices, Aguilera seeks to avoid the Act's exclusivity and pursue an independent tort claim. Again, the majority does not view Aguilera's complete neglect of these statutory remedies as any barrier to his pursuing an independent tort claim. I strongly disagree. The effectiveness of the Workers' Compensation Act will be seriously undermined if we allow avoidance of the remedies the Act provides to address claims-handling problems and, instead, sue carriers in tort for intentional infliction of emotional distress. The Act was intended to be the sole remedy for workers' compensation injuries and, as shown above, it contains remedies specifically designed for unfortunate cases like Aguilera's where a claimant's attempts to obtain proper medical care for work-related injuries are thwarted by a carrier. The Act does not ignore the reality that claimants will encounter problems with carriers and the Act provides remedies. I do not think we should permit a claimant to completely ignore the remedies provided by the Act. To do so imprudently erodes the vitally important doctrine of exclusivity.

C. Erosion of the Doctrine of Exclusivity
Having discussed how Aguilera's claim is distinguishable from Sibley and the significance of his avoiding the statutory remedies expressly designed to address his problems with Inservices, it is important to briefly address the broader impact the majority's decision will have upon the doctrine *105 of exclusivity. Commentators nationwide have noted that the emergence of the bad-faith exception[7] to workers' compensation immunity has dramatically accelerated the erosion of the exclusive remedy doctrine.[8] The majority decision now adds Florida to the list of states that have severely eroded the doctrine. While the "temptation to shatter the exclusiveness principle by reaching for the tort weapon whenever there is a delay in payments or a termination of treatment is all too obvious,"[9] I believe that courts should be extremely hesitant to yield to that temptation. The bad-faith exception chips away at the very foundation of the workers' compensation system by unsettling the bargained-for balance between renunciation of common-law tort damages and the strict liability of employers for work-related injuries. If an employee with a workers' compensation claim can recover both tort damages and workers' compensation benefits, then the fundamental quid pro quo of workers' compensation is gone. And such a result is in direct conflict with the legislative statement that "[t]he workers' compensation system in Florida is based on a mutual renunciation of common-law rights and defenses by employers and employees alike." § 440.015, Fla. Stat. (2000).
Though the majority decision may be logically consistent with Sibley, it imprudently expands its reach. Aguilera had a remedy unavailable to Sibley. At any point during the six months he was dealing with Inservices, Aguilera could have asked a judge for emergency relief under the Act. He elected not to do so. I believe that the confluence of Aguilera's decision to ignore the Act's remedies, the extreme difficulty of defining when a claims-handling dispute is sufficiently outrageous to permit an independent tort claim for emotional distress, and the vital importance of exclusivity to an effective worker's compensation scheme dictates approval of the Third District's well-reasoned decision.

II. NO EXPRESS AND DIRECT CONFLICT
Not only do I disagree with the majority's decision on the merits, I also submit *106 that this Court lacks jurisdiction to take this case. Because of the substantive importance of this case, a detailed discussion of this jurisdictional question is appropriate.
The majority cites article V, section 3(b)(3) of the Florida Constitution as the basis of its authority for accepting jurisdiction of this case. Article V, section 3(b)(3) provides that the Supreme Court may review any decision of a district court of appeal that "expressly and directly conflicts with a decision of another district court of appeal or of the supreme court on the same question of law." (Emphasis added.) In order for this Court to exercise its conflict jurisdiction under this provision, the conflict must be express and direct and contained within the four corners of the opinion sought to be reviewed. Reaves v. State, 485 So.2d 829 (Fla.1986). In this case, there is no express and direct conflict between Aguilera and Sibley because the cases concern two different questions of law. In Aguilera, the Third District expressly held that "the allegations in the present case are insufficient to come within any exception to the statutory immunity provided by section 440.11, Florida Statutes (2000)." Id. at 468. Sibley addresses only the question of exclusivity as it relates to section 440.37, Florida Statutes (1989). Section 440.37 has long since been repealed and is entirely irrelevant to Aguilera's specific claim. Sibley never addresses any of the statutory sections addressed in Aguilera or Turner, much less the broad question of immunity.

A. Understanding Sibley

In Sibley, we considered the following certified question from the Second District Court of Appeal:
WHEN AN EMPLOYEE CLAIMS INJURY ARISING FROM THE ALLEGED FRAUDULENT ACT OF AN EMPLOYER/CARRIER COMMITTED IN THE COURSE OF A PROCEEDING INITIATED PURSUANT TO CHAPTER 440[, FLORIDA STATUTES (1989),] IS A CRIMINAL ADJUDICATION OF GUILT PRESCRIBED IN SECTION 440.37 A CONDITION TO THE MAINTENANCE OF AN INDEPENDENT TORT ACTION?
596 So.2d at 1049. Sibley, a worker's compensation claimant, sued the carrier, Adjustco, seeking compensation for intentional fraudulent acts of its adjuster during the claims-handling process. Sibley's complaint did not allege that a criminal adjudication of guilt had resulted from those fraudulent acts. Relying upon section 440.37(2)(c), Adjustco sought to have those claims dismissed for lack of subject-matter jurisdiction.[10] The trial court granted Adjustco's motion; however, instead of relying upon section 440.37, the trial court based its ruling on section 440.11. The Second District affirmed the trial court; but it reached its decision without any reliance upon section 440.11. Specifically, the Second District stated that "[t]he focus of Adjustco's contentions ... was the effect of section 440.37 and its subparts upon *107 Sibley's claims. The final judgment, however, is predicated on section 440.11 .... We do not rest our affirmance upon section 440.11." Sibley v. Adjustco, Inc., 573 So.2d 353, 354 (Fla. 2d DCA 1990). The Second District went on to say that "[i]n assessing the correctness of the trial court's disposition of Sibley's pleaded claims, we need neither consider, dissect nor analyze the decisions dealing with `bad faith' and resultant penalties in the handling of the claim." Id.
In quashing the Second District's decision, this Court acknowledged that the Second District "did not rest its affirmance upon section 440.11." Sibley, 596 So.2d at 1050. Likewise, in answering the question as certified, this Court did not rest its decision on section 440.11 (or any other provision of chapter 440, except section 440.37). Indeed, section 440.11 is completely absent from the question of law in Sibley. We defined the question of law in Sibley as follows:
In answering the certified question, we must determine whether the provisions of sections 440.37(1)(b) and 440.37(2)(e), Florida Statutes (1989), which require a criminal conviction as a condition precedent to the maintenance of a tort action by an employee who claims to have been defrauded, are the exclusive remedy or an alternative cause of action.
Sibley, 596 So.2d at 1050. Without any reliance upon or discussion of section 440.11 whatsoever (much less any relationship between section 440.11 and section 440.37), this Court specifically held that "section 440.37 provides only an alternative cause of action rather than the exclusive cause of action under these circumstances." Id. at 1050. Alternatively stated, the question of immunity under section 440.11 or otherwise was never before this Court in Sibley. The issue in Sibley was not whether section 440.11 gave the carrier immunity from suit. The question of law in Sibley was whether the statutory cause of action in section 440.37 was the exclusive remedy or an alternative cause of action for an employee who claimed to have been defrauded by an insurance carrier.[11]

B. Distinguishing the Questions of Law
Turning to the case before us, absolutely nothing within the four corners of the Third District opinion in Aguilera expressly and directly conflicts with our holding on the question of law that was before this Court in Sibley. To reiterate, in Sibley this Court expressly said that the question of law before it was to "determine whether the provisions of sections 440.37(1)(b) and 440.37(2)(e), Florida Statutes (1989), which require a criminal conviction as a condition precedent to the maintenance of a tort action by an employee who claims to have been defrauded, are the exclusive remedy or an alternative cause of action." Id. at 1050. Section 440.37 and its unique, statutory cause of action no longer existed at the time of Aguilera's accident in 1999. Section 440.37 had been repealed six years earlier, the year after Sibley was decided.[12]
*108 Obviously, under these circumstances, the question of law before us in Aguilera not only does not but also could not expressly and directly address the narrow question of law answered in Sibley. As stated earlier, the express holding in Aguilera is that the employee's allegations "are insufficient to come within any exception to the statutory immunity provided by section 440.11, Florida Statutes (2000)." Id. at 468 (emphasis added). Nowhere in the decision below, either in the majority or the dissent, does Aguilera address the applicability of section 440.37 (or its successor, section 440.105) to the employee's claim. Instead, making a mistake similar to the majority of this Court, the majority in the Third District acknowledges but never questions the continued viability or applicability of the express holding in Sibley. It expressly acknowledged the general principle that a compensation carrier is not immune from all intentional torts and cited to Sibley as one of two examples of this general principle of law. The Third District stated:
The workers' compensation scheme does not immunize a compensation carrier from wrongdoing which occurs independently of its claims handling. Sibley v. Adjustco, Inc., 596 So.2d 1048 (Fla.1992)(adjuster who fraudulently edited the statement of a claimant which results in the denial of benefits constitutes an intentional act independent of the handling of a workers' compensation claim); cf. Associated Indus. of Fla. Prop. & Cas. Trust v. Smith, 633 So.2d 543 (Fla. 5th DCA 1994) (it is not an independent tort for a workers' compensation carrier to withdraw benefits, as a wrongful termination can be remedied under the statute). Thus once a trial court determines a plaintiff does have a remedy under the Workers' Compensation Act, the only remaining issue to be considered prior to dismissal is whether the plaintiff's allegations involve wrongdoing independent of the workers compensation claim.
Aguilera, 837 So.2d at 466-67.
As I have shown, there is no express and direct conflict between the question of law answered in the decision of this Court in Sibley and the decision by the Third District in Aguilera. Sibley expressly limited itself to addressing the narrow question of exclusivity relative solely to section 440.37, a statutory provision long since repealed, and the unique statutory cause of action section 440.37 provided to claimants. Sibley never discusses a statutory basis within chapter 440 for exclusivity such as section 440.11. On the other hand, the opinion in Aguilera never discusses section 440.37 or the exclusivity of its unique statutory cause of action. Instead, Aguilera addresses the broader question of exclusivity that arises from section 440.11, the general exclusivity section of chapter 440, and how that section's express grant of immunity applies to a specific, independent tort not relevant in Sibley. There is no conflict between Sibley and Aguilera on the same question of law. Therefore, as with Turner, we should concede and accept the constitutional limitations to our jurisdiction, acknowledge the absence of express and direct conflict with Sibley, and discharge jurisdiction.

CONCLUSION
I believe, as the district court stated, that Aguilera's claim is barred by the exclusivity of the Workers' Compensation Act. Aguilera could have and should have pursued the statutory remedies available to him within the Act. Allowing claimants such as Aguilera to forego the remedies available to them under the Act in order to bring an intentional tort claim for emotional distress that arises directly out of the claims-handling process will severely undermine *109 the effectiveness of the Workers' Compensation Act. As I have queried, from here on, how does one identify the point where a claims-handling dispute, clearly resolvable within the Act, gives birth to an independent tort of intentional infliction of emotional distress? Is this simply a question of fact to be determined by the jury in the independent action? The majority fails to answer this vitally important question. And it is from this failure that much unnecessary trouble will be born.
We should deny jurisdiction in this case. Alternatively, we should affirm the well-reasoned opinion of the Third District and refuse to further destroy the foundation of the delicate but vitally important, mutually beneficial compromises upon which the Workers' Compensation Act is constructed. In addressing the question of exclusivity, the district court made a judicious distinction between Turner and the case before it. We should affirm that decision.

APPENDIX
An excerpt from the Third District's decision in Aguilera:
Aguilera does not argue that he is without remedies under the Act. And we note the Act does contain provisions addressing his allegations that the defendants lied to him concerning available benefits, refused to schedule appointments with physicians, wrongfully attempted to deprive or ignored his request for medical treatment and insisted upon tests to evaluate his medical condition which were contradicted by his medical condition [n. 2]. Aguilera's primary contention is that the exclusivity provisions of the workers' compensation statutes do not bar his intentional tort claim because the defendants' conduct was outrageous and resulted in injuries separate and distinct from the work related injury [n. 3]. We disagree.
[N. 2] If a carrier "lies" regarding available benefits, such statements constitute a criminal offense and subject the carrier to penalties under section 440.105, Florida Statutes (2000). The Department of Insurance is authorized to revoke or suspend the authority of a workers' compensation carrier for violation of Section 440.105. See § 440.106(3), Fla. Stat. (2000). Damages for bad faith are also authorized by the Act. See Florida Erection Serv., Inc. v. McDonald, 395 So.2d 203 (Fla. 1st DCA 1981).
A claimant has a number of remedies if a workers' compensation carrier wrongfully attempts to, or deprives or ignores, a request for medical treatment. Section 440.20, Florida Statutes (2000), sets a deadline for the timely payment of compensation claims and establishes penalties for late payments. Pursuant to section 440.34(3), Florida Statutes (2000), a claimant can recover attorneys' fees from the carrier in a claim for medical benefits. Further, section 440.192, Florida Statutes (2000), provides a procedure for resolving any benefit disputes between a carrier and a claimant and sets strict deadlines for dispute resolution.
A carrier is entitled to request an independent medical examination concerning compensability or medical benefits. See § 440.13, Fla. Stat. (2000). However, if a claimant believes the exam would be inconsistent with his medical condition, he can seek relief from a judge of compensation claims who has the power to deny a carrier's request. See Watkins Eng'r & Constructors v. Wise, 698 So.2d 294 (Fla. 1st DCA 1997); Fla. R. Work. *110 Comp. P. 4.065. Aguilera thus does have remedies under the Act.
[N. 3] The dissent relies on Turner v. PCR, Inc., 754 So.2d 683 (Fla.2000), to support their claim that Inservices be denied the immunity provided by the Act. However, Turner is distinguishable from the instant case.

Turner involved the continued use of a chemical, TFE by an employer, PCR, who had advanced knowledge of TFE's ultrahazardous nature. In fact, the manufacturer of TFE, notified PCR of its intention to discontinue supplying TFE throughout the United States because of the inherent danger and the high risk of injury of using TFE. In addition, PCR had first hand knowledge of the high risk associated with handling TFE because there had been at least three other similar uncontrolled explosions in less than two years at PCR's chemical plant.
PCR ignored the warnings and danger signs and continued to allow its employees to use TFE in unsafe procedures because PCR needed to meet a fast approaching contractual deadline. As a result, one employee died and another received serious injuries in an explosion caused by TFE.
The injuries in Turner, can be traced directly to the grossly negligent actions of PCR. If not for PCR's decision to continue to use TFE, the employees would not have been injured.
In contrast, Inservices had no part in causing Aguilera's injuries. Aguilera would have needed medical care with or without Inservices's alleged misconduct. Thus, there is no separate act, independent from Inservices's handling of the claim, which injured or "to a substantial certainty" would have caused Aguilera's injuries. Furthermore, as noted prior, other remedies for Aguilera's claims are provided for by the Act.
In order for an independent tort to exist, there must be facts that are distinct from a breach of contract. See HTP, Ltd. v. Lineas Aereas Costarricenses S.A., 685 So.2d 1238 (Fla.1996); Invo Florida, Inc. v. Somerset Venturer, Inc., 751 So.2d 1263 (Fla. 3d DCA 2000); Here, all of Aguilera's allegations deal with the manner in which his claim was handled by the defendants pursuant to the workers' compensation insurance contract. Since all of the allegations relate to the defendants alleged breach of contractual obligations under the workers' compensation policy, no independent acts have been alleged and thus there is no independent tort. See Sullivan v. Liberty Mut. Ins. Co., 367 So.2d at 658. Aguilera's injuries arising from any delays in medical treatment were incidental to his original injury and compensable by his employer's compensation carrier. [n. 4] See Old Republic Ins. Co. v. Whitworth, 442 So.2d at 1079.
[N. 4] Aguilera's argument that a carrier does not have immunity for acts which occur after a workplace injury, contradicts the obvious intent of section 440.11(4), Florida Statutes (2000), as well as common sense. Section 440.11(4) extends immunity from liability to the employer's workers' compensation carrier. Thus a carrier is immune from tort liability for acts taken to discharge its obligations under the Workers' Compensation Act. These obligations would necessarily include the adjustment of claims. The adjustment of a workers' compensation claim presupposes an injury has already occurred, because if a worker *111 has not already been injured, there would be no claim to adjust. If we were to adopt Aguilera's reasoning, the result would be an effective stripping of all immunity because a carrier must necessarily act in the adjustment of a claim after an injury has already occurred. This is simply not a common sense construction and would contradict the intent of the statute, as well as encourage a multiplicity of collateral lawsuits.
In conclusion, we find the allegations in the present case are insufficient to come within any exception to the statutory immunity provided by section 440.11, Florida Statutes (2000). See Sheraton Key Largo v. Roca, 710 So.2d at 1016; Old Republic Ins. Co. v. Whitworth, 442 So.2d at 1078; Sullivan v. Liberty Mutual Insurance Co., 367 So.2d at 658. Accordingly, the trial court erred in finding the cause of action was not barred by the Act, and the case is hereby reversed and remanded with instructions to enter a final order dismissing the complaint.
Inservices, Inc. v. Aguilera, 837 So.2d 464, 467-68 (Fla. 3d DCA 2002).
WELLS and CANTERO, JJ., concur.
NOTES
[1] The petitioner initially sought review based on conflict between the decision below and the decisions in both Sibley and Turner v. PCR, Inc., 754 So.2d 683 (Fla.2000). In Turner, this Court reaffirmed the existence of an intentional tort exception to an employer's workers' compensation immunity and held that the conduct of the employer must be evaluated under an objective standard. See 754 So.2d at 684.
[2] Judge Shevin in his well-articulated dissent below cautioned that "[a]ny summary of the facts works an injustice to the events leading up to the lawsuit, and pale the magnitude of the injuries intentionally inflicted upon the Aguileras." Inservices, 837 So.2d at 469 (Shevin, J., dissenting in part, concurring in part).
[3] In the instant action, the amended complaint also asserted a cause of action for common law bad faith. Dismissal of Aguilera's simple bad faith count was proper. Florida does not recognize a common law bad faith action in this context. See Talat Enters., Inc. v. Aetna Cas. & Sur. Co., 753 So.2d 1278, 1281 (Fla.2000). While Florida does recognize a statutory bad faith cause of action, see § 624.155, Fla. Stat. (2000), such cause is inapplicable to insurance carriers in workers' compensation cases. See § 440.11(4), Fla. Stat. (2000) ("Notwithstanding the provisions of s[ection] 624.155, the liability of a carrier to an employee or to anyone entitled to bring suit in the name of the employee shall be as provided in this chapter, which shall be exclusive and in place of all other liability."). Therefore, even if Aguilera had asserted a statutory bad faith action, in addition to or as opposed to a common law bad faith action, it would have been properly dismissed.
[4] Florida courts have routinely affirmed the exclusivity of the Workers' Compensation Act to remedy cases of delay or wrongful termination of benefits. See Sheraton Key Largo v. Roca, 710 So.2d 1016 (Fla. 3d DCA 1998); Montes de Oca v. Orkin Exterminating Co., 692 So.2d 257 (Fla. 3d DCA 1997); Associated Indus. of Florida Prop. & Cas. Trust v. Smith, 633 So.2d 543 (Fla. 5th DCA 1994); Southeast Administrators, Inc. v. Moriarty, 571 So.2d 589 (Fla. 4th DCA 1990); Old Republic Ins. Co. v. Whitworth, 442 So.2d 1078 (Fla. 3d DCA 1983); Sullivan v. Liberty Mut. Ins. Co., 367 So.2d 658 (Fla. 4th DCA 1979); see also Connolly v. Maryland Cas. Co., 849 F.2d 525 (11th Cir.1988).
[5] The relevant portion of the Third District Court's opinion that discusses this issue and other relevant matters is attached as an appendix at the end of this opinion.
[6] Ignorance of these remedies cannot be an issue in this case. The record reflects that Aguilera was represented by counsel very early in his dealings with Inservices.
[7] Additionally, on the question of carrier immunity from such claims, I agree with the court below when it stated:

Aguilera's argument that a carrier does not have immunity for acts which occur after a workplace injury, contradicts the obvious intent of section 440.11(4), Florida Statutes (2000), as well as common sense. Section 440.11(4) extends immunity from liability to the employer's workers' compensation carrier. Thus a carrier is immune from tort liability for acts taken to discharge its obligations under the Workers' Compensation Act. These obligations would necessarily include the adjustment of claims. The adjustment of a workers' compensation claim presupposes an injury has already occurred, because if a worker has not already been injured, there would be no claim to adjust. If we were to adopt Aguilera's reasoning, the result would be an effective stripping of all immunity because a carrier must necessarily act in the adjustment of a claim after an injury has already occurred. This is simply not a common sense construction and would contradict the intent of the statute, as well as encourage a multiplicity of collateral lawsuits.
Aguilera, 837 So.2d at 468 n. 4.
[8] See Robert R. Potter & Joan T.A. Gabel, The Emerging Bad Faith Cause of Action Takes on the Exclusive Remedy Doctrine, 48 Mercer L.Rev. 63, 64 (1996); Joan T.A. Gabel et al., The New Relationship Between Injured Worker and Employer: An Opportunity for Restructuring the System, 35 Am. Bus. L.J. 403, 432-33 (1998); Wendell J. Kiser, Bad Faith Handling of Workers' Compensation Cases: Can It Give Rise to a Separate Tort Action Against Employers, Carriers, or Self-Insureds?, 23 Tort & Ins. L.J. 147 (1987).
[9] 2 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 104.05[3] (desk ed.2004).
[10] Section 440.37 provided criminal penalties for fraudulent acts by certain persons involved in the workers' compensation system. Subsection (2)(c) stated:

Any person damaged as a result of a violation of any provision of this subsection, when there has been a criminal adjudication of guilt, shall have a cause of action to recover compensatory damages, plus all reasonable investigation and litigation expenses, including attorney's fees at the trial and appellate courts.
§ 440.37(2)(c), Fla. Stat. (1989). Section 440.37 was repealed in 1993. See ch. 93-415, § 109, Laws of Fla. In its place, the Legislature enacted section 440.105, Florida Statutes (Supp.1994). This is a similarly worded statute, but the express private right of action of section 440.37(2)(c) is eliminated.
[11] Notably, Sibley was decided before the passage of section 440.015, Florida Statutes. This statute, passed in 1990, provides that "[t]he workers' compensation system in Florida is based on a mutual renunciation of common-law rights and defenses by employers and employees alike." § 440.015, Fla. Stat. (2000).
[12] As noted in footnote 7, section 440.37 was replaced in 1993 by section 440.105. However, section 440.105 is never discussed by the Third District below or the majority of this Court.